FILED
IN CLERK'S OFFICE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2004 JUN -8 P 4: 01

U.S. DISTRICT COURT
DISTRICT OF MASS.

```
UNITED STATES OF AMERICA      )
                              )    CRIMINAL NO. 03-10333-JLT
          v.                  )
                              )
DALE R. BERNARD,              )
          Defendant           )
                              )
```

### Affidavit Of Michael P. Cashman

I, Michael P. Cashman, on oath depose and state that:

1.     I am a Special Agent with the Drug Enforcement
Administration ("DEA") and I have been so employed for
approximately 14 years.  I have been assigned to the Boston Field
Office for approximately three years.  I am currently a member of
DEA's New England Division Clandestine Laboratory Enforcement
Team and, as such, I have been involved in several investigations
involving methamphetamine.  Prior to coming to Boston, I was
assigned as an Instructor at the DEA-FBI Training Academy in
Quantico, Virginia for approximately four years.  During that
assignment, I taught DEA agents, FBI agents, other federal
agents, state and local police officers, and foreign police
officers about methamphetamine and clandestine methamphetamine
laboratories.  Prior to that, I was assigned to the San Diego,
California Field Office for approximately seven years.  During
that assignment, I was involved in numerous investigations and
arrests involving methamphetamine distributors as well as the
manufacturing of methamphetamine at clandestine laboratories.
During my career at DEA, I have participated in the preparation
and execution of numerous search warrants for various locations
at which methamphetamine was being stored and/or manufactured.

2.     Based on my training and experience, I know that
methamphetamine is a Schedule II controlled substance under
federal law, that it is secretly manufactured in the United
States, and that it is transferred from the West Coast to the
East Coast by means of the mail system and/or private shipping
companies.  In addition, I know that methamphetamine is commonly
consumed by users by smoking, snorting, eating, or injecting it.
Methamphetamine distributors often sell the product in a crystal
form commonly referred to as "ice" and typically having a purity
level in excess of 80%.  This form of methamphetamine has the
appearance of rock candy or ice crystals and it is commonly
referred to by users and dealers as crystal methamphetamine.
Other names for methamphetamine with which I am familiar are
"glass," "crystal," "crank," "speed," "tina," and "go fast."

3.    I am submitting this affidavit in support of the government's application to detain Dale Bernard ("Bernard"), a 41-year old man who was born in 1963.  As set forth more fully below, the DEA investigation has revealed that Bernard is a source of supply of methamphetamine for various dealers in the greater Boston area.

4.    The facts summarized in this affidavit are based on my personal involvement in the investigation of Bernard as well as on information provided to me by other law enforcement agents/officers and on information obtained from various public and private entities.  Since I am submitting this affidavit for the limited purpose of supporting the government's motion for detention, I have not included each and every fact that I have learned during the investigation.

### DEA's MET Team Investigation

5.    I am aware that DEA's Mobile Enforcement Team ("MET") was conducting an investigation during the summer and fall of 2003 of a methamphetamine dealer who was selling methamphetamine in Boston and Provincetown.  During that investigation, a cooperating witness ("CW-1") made six separate purchases of methamphetamine directly from the dealer from July 1, 2003 to and including September 10, 2003.[1]  The methamphetamine sold by the dealer was analyzed at a DEA laboratory and was determined to have purity levels ranging from 91% to 97%, except for what was sold on July 1, which had a purity level of 73%.

6.    On October 9, 2003, DEA MET agents arrested the dealer on a criminal complaint and executed a federal search warrant at the dealer's residence.  The agents recovered various items from the residence, including bags of methamphetamine having a purity level of 91%.  After being advised of his/her constitutional rights and agreeing to waive his/her rights, the dealer stated that he/she wished to cooperate with DEA.  The dealer stated that

---

[1]  CW-1 had been a user of methamphetamine and other controlled substances.  During the summer of 2003, CW-1 had been stopped by local police officers and was found to be in possession of a small quantity of methamphetamine.  While CW-1 was not charged with possession of methamphetamine in state court, CW-1 was subsequently contacted by a DEA Task Force Agent assigned to the MET investigation and decided to cooperate with the investigation.  During the investigation, CW-1 was paid money to reimburse CW-1 for certain expenses and to assist in relocating outside of Massachusetts.

his/her source of supply was Bernard, that he/she regularly purchased methamphetamine from Bernard over the past year in quantities ranging from one-quarter ounce to one ounce and resold the methamphetamine in smaller quantities to his/her customers, and that Bernard either came to the dealer's residence or met with the dealer at other locations in order to supply the methamphetamine to the dealer.  The dealer further stated that he/she had gone to Bernard's residence to obtain methamphetamine and the dealer described the residence as being on the Malden-Medford-Somerville line.

7.    The dealer further stated that he/she often communicated with Bernard over Bernard's cellular telephone, which was telephone number (978) 314-8177.  I have reviewed subscriber and call detail records from Verizon Wireless, which records revealed that this telephone number is subscribed to in the name of Dale R. Bernard, Unique Gifts, 43 Riverside Avenue, #435, Medford, Massachusetts.  I learned from U.S. Postal Inspector Michael McCarron (who is also involved in this investigation and who has visited this address) that this address was a Mailboxes, Etc./UPS Store business.  I reviewed records from this facility indicating that Bernard has rented a mailbox, No. 435, at this business since at least November 27, 2001 and that he used a California driver's license as a form of identification.

8.    During the DEA MET interview on October 9, 2003, the dealer's cellular telephone rang, with the caller identification feature displaying "617-407-2444 Bernard" on the handset.  The dealer was directed by DEA agents not to answer the telephone. The dealer stated that this was Bernard's "new" cellular telephone number and that Bernard was probably calling to arrange a delivery of methamphetamine to the dealer.  I reviewed subscriber records from T-Mobile, which records revealed that this telephone number is subscribed to in the name of Dale Bernard, 43 Riverside Avenue, Suite 435, Medford, Massachusetts.

9.    On October 9, 2003, at DEA MET's request, the dealer placed a consensually-recorded telephone call to (617) 407-2444 and spoke to Bernard about purchasing methamphetamine from Bernard.  In cryptic conversation, Bernard indicated that he did not have any at that time, that he was expecting to receive more late the following morning, and that he would call the dealer the next day (October 10).  After this conversation, the dealer stated to DEA agents that he/she believed that Bernard obtained methamphetamine through packages mailed from outside of Massachusetts.

3

10.  I am aware that DEA MET agents obtained a Massachusetts driver's license photograph of Bernard and various records from the Massachusetts Registry of Motor Vehicles ("RMV") relating to Bernard.  According to the RMV records, Bernard resided at 43 Riverside Avenue, Suite 435, Medford, Massachusetts, which, as stated above, is the Mailboxes, Etc./UPS Store business.  Bernard also used this address to register two automobiles in his name: a 1999 brown Infiniti I-30 and a 1998 green Nissan Altima. Bernard's driver's license photograph matched the description of Bernard provided by the dealer on October 9: a tall, balding, white male.  The photograph depicts a balding white male who is stated to be 6'3" tall.

11.  I am aware that DEA MET agents obtained records from the Massachusetts Electric Company, which records revealed that Bernard received electric service at 36 Gale Street in Malden. On October 10, 2003, DEA agents went to this address and observed that the two automobiles registered to Bernard were parked in the driveway.  This address is located near the boundaries of both Medford and Somerville.  During the morning and early afternoon of October 10, Postal Inspector McCarron performed surveillance on the Mailboxes, Etc./UPS Store business but did not observe Bernard there and learned that this business did not have any packages to be delivered to Bernard or to his rented mailbox.

12.  In the early afternoon of October 10, 2003, DEA surveillance agents observed a male, who was later identified as Eric Sayers, exit from the front door at 36 Gale Street, enter a parked Chevrolet Blazer, and drive away.  Sayers was followed as he drove the Blazer from Malden into Medford and then onto Route 93 southbound into Boston.  While driving on Route 93 in Boston, Sayers was stopped by a uniformed Massachusetts state trooper for motor vehicle violations.  During the course of this stop, the trooper recovered suspected methamphetamine and suspected cocaine from the automobile and Sayers was placed under arrest on state narcotics charges.[2]

13.  At about 2:15 p.m. on October 10, 2003, a DEA MET agent observed Bernard standing on the front porch at 36 Gale Street

_____

[2]  On October 24, 2002, a year prior to the incident referred to above, I assisted the Boston Police Department in the execution of a state search warrant at an apartment rented by Eric Sayers at 650 Huntington Avenue in Boston.  As a result, I am aware that the police recovered methamphetamine, ketamine, ecstasy, other drugs, cash, paraphernalia, and Federal Express receipts from the apartment.

with a Federal Express box under his arm.  While speaking on his cellular telephone, Bernard walked from the front of the house to the rear of the house and he then entered the house through the back door.  These observations were made at about the same time that Sayers was being stopped by the uniformed trooper in Boston. The trooper observed that Sayers was speaking continuously on his cellular telephone during the motor vehicle stop up to the time that he was arrested.

14.  I am aware that Postal Inspector McCarron later determined that Bernard rented a second mailbox at a business called Discount Forwarding Services at 703 Eastern Avenue (Route 60) in Malden.  This mailbox, No. 339, was rented to Dale Bernard of 702 Massachusetts Avenue, Boston, Massachusetts as of September 5, 2003.  Bernard also authorized deliveries addressed to Unique Gifts.  Inspector McCarron later determined from personnel at this business that Bernard's mailbox had received a Federal Express package on the morning of October 10, 2003.

15.  In the late afternoon of October 10, 2003, DEA surveillance agents observed Bernard and another male exit from 36 Gale Street and drive to the nearby parking lot of a Foodmaster supermarket in Medford.  Bernard was observed exiting from the vehicle in which he arrived and entering a second vehicle, which contained a male driver, while the driver of the first vehicle waited in the lot.  Shortly thereafter, Bernard exited from the second vehicle and entered a Brooks Pharmacy while the driver of the second vehicle was observed driving to a nearby location, stopping, and looking directly down into his lap as if he was inspecting something. Bernard was later observed exiting from the Brooks Pharmacy with shopping bags and leaving the area in the first vehicle.  It was the opinion of the DEA surveillance agents that Bernard made a delivery of something to the driver of the second vehicle.

16.  On the evening of October 10, 2003, at DEA's request, the dealer referred to in ¶¶ 5-9 above made a consensually-recorded telephone call to (617) 407-2444 and asked Bernard whether he got "what you were waiting for" (i.e., methamphetamine).  Bernard replied that he had received "half" of the shipment.  The dealer asked if he/she could get "a whole one" (i.e., one ounce of methamphetamine) and Bernard replied, "I doubt it, I only got four [ounces] in and of the four, two [ounces] are already sold."  Bernard further explained that he expected to get "four more" the next day but that two of those were already "spoken for" (i.e., reserved for other customers). Bernard indicated that he would be placing another order for methamphetamine on the following Monday (October 13).  In a

second consensually-recorded telephone conversation later that evening, Bernard agreed to sell the dealer a half-ounce of methamphetamine and to deliver it to the dealer's residence that night.

17.  On the night of October 10, 2003, DEA surveillance agents observed Bernard exit from 36 Gale Street, enter his Infiniti automobile, and drive away.  Bernard was followed as he drove in the direction of the dealer's residence.  At one point, Bernard called the dealer to advise that he was "stuck in traffic" on his way to the dealer's residence.  A short time later, Bernard called the dealer to advise that he had just seen several "guys with cell phones" near the dealer's residence and that he had decided to cancel the proposed transaction.  Based on this sighting and other information that Bernard claimed to have received from a mutual acquaintance, Bernard believed that the dealer might be under law enforcement scrutiny and advised the dealer to "take off for New York for a while."  Surveillance agents then observed Bernard's Infiniti driving away from the area of the dealer's residence.

### Further Investigation Of Bernard

18.    On various occasions during October and November 2003, Postal Inspector McCarron obtained and searched through the discarded trash for 36 Gale Street.  Inspector McCarron recovered several plastic bags containing a powder residue; the contents of certain bags were tested at the DEA laboratory and were determined to contain residue of methamphetamine and cocaine. Inspector McCarron also recovered various documents, including Federal Express airbills referencing packages mailed in 2003 from Dale Bernard and/or Unique Gifts to persons in California and Florida; a Federal Express airbill referencing a package mailed on October 17, 2003 from "John Dixon" of Boston to a person in Phoenix, Arizona; pieces of paper containing handwritten notations of names, telephone numbers, and amounts; boarding passes for flights made by Bernard; telephone statements; and bank records.  Inspector McArron also recovered a box for a digital scale, a UPS shipping box, a Qualcomm cellular telephone, and a computer board.  Inspector McCarron also recovered a business card identifying "Dale" as president of Unique Gifts at 43 Riverside Avenue, Suite 435, Medford, Massachusetts.  As stated above, this is the address for the Mailboxes, Etc. business.

19.  I am aware that Inspector McCarron obtained numerous business records, via subpoena, from Federal Express.  These records documented numerous Federal Express packages mailed to or

from Dale Bernard and/or Unique Gifts and various persons in California from December 12, 2001 to July 14, 2003. The packages sent to Bernard and/or Unique Gifts were sent to the Mailboxes, Etc./UPS Store address in Medford. During this investigation, I have searched various databases and other public records and I cannot find any record of a business called Unique Gifts nor have I been able to locate an actual place of business for Unique Gifts. In addition, I have been unable to locate any legitimate employment held by Bernard.

20. I am aware that on the morning of October 20, 2003, Inspector McCarron determined that the Federal Express facility in Medford was holding a package addressed to Unique Gifts, Route 60 Plaza, 703 Pleasant Street, Box 339, Malden, Massachusetts. This is the address for Discount Forwarding Services, the business where Bernard rented a second mailbox. The package had been sent by a person in Phoenix, Arizona and it was marked Priority Overnight Delivery. A Massachusetts state trooper went to the facility with a trained narcotics detection dog, which sniffed the exterior of the package and alerted to the odor of a controlled substance. That morning, DEA surveillance agents observed Bernard drive from 36 Gale Street to the Federal Express facility in Medford and to Discount Forwarding Services in Malden but he did not obtain the package. That evening, Inspector McCarron, DEA, and the Massachusetts State Police executed a state search warrant on the package and recovered bags of what was later analyzed to be 220.1 grams of 88% pure methamphetamine.

## Controlled Purchases From Bernard

21. In or about December 2003, I interviewed a cooperating witness ("CW-2"), who stated that Bernard lived with a male named Douglas Tribley at 36 Gale Street in Malden, that Tribley had bragged that Bernard was the biggest distributor of methamphetamine in the Boston area, and that Tribley said Bernard received Federal Express packages from California containing 1-2 pounds of methamphetamine. CW-2 also stated that Bernard was aware that the police were looking at him in reference to a package that had come to a mailbox rented by him.[3]

---

[3] CW-2 has been a drug user in the past and has prior convictions for (1) possession of cocaine – 1988 – suspended sentence; (2) breaking and entering in the daytime and larceny – 1990 – probation; and (3) trafficking in cocaine – 1990 – 5 years' imprisonment. In October 1998, CW-2 was arrested and charged with trafficking in cocaine and related narcotics offenses. In December 2000, CW-2 was charged in a Superior Court

22.  On December 30, 2003, at my request, CW-2 had a consensually-recorded in-person meeting with Bernard inside 36 Gale Street.  They discussed Bernard selling methamphetamine to CW-2, who, in turn, would sell it to his/her customers.  Bernard initially stated that it was "difficult" right now but that "during my peak, I was bringing 3 pounds a week into the city." Bernard explained during the conversation that he had been responsible for 80-90% of the methamphetamine that came into Boston, that he had been "on top of the food chain," and that he had been "number one" in Boston "for a long time."  Bernard stated that, due to a problem, he had stopped everything, adding that "when things start happening, you just want to be out of sight."  Bernard, however, stated that he could still get methamphetamine and that he had three suppliers – "one in San Diego, one in Los Angeles, and one in Phoenix" – just waiting "to give it to me."  Bernard spoke about the logistical issues involved in getting the money to the suppliers and in getting the methamphetamine from the suppliers and stated that he used code words when he spoke on the telephone: "Tina" refers to methamphetamine; "Connie" refers to cocaine; and "Kitten" refers to ketamine.  Bernard stated he allowed some customers to come to 36 Gale Street but that, most of the time, he met the customers somewhere else.  Bernard spoke extensively about his methamphetamine business and referred to 36 Gale Street as "the crystal palace, the house that Tina built."  Bernard agreed to sell up to one ounce of methamphetamine to CW-2.

23.  On the evening of January 2, 2004, while under DEA surveillance and while wearing a recording device, CW-2 had an in-person meeting with Bernard inside 36 Gale Street.  During this meeting, Bernard sold CW-2 a half-ounce of methamphetamine for $1,100 in cash.  The methamphetamine was sent to a DEA laboratory and was determined to be 17.3 grams of 81% pure methamphetamine.  During this meeting, Bernard spoke about waiting for another shipment of methamphetamine from a source who obtained it from a laboratory located a few hours away.  He also spoke about traveling to California to acquire more methamphetamine.

24.  On the afternoon of January 19, 2004, while under DEA surveillance and while wearing a recording device, CW-2 had an in-person meeting with Bernard in the same Foodmaster parking lot

with a separate trafficking in cocaine case.  CW-2 was cooperating with state and federal law enforcement in an effort to receive a reduced sentence in these cases.  CW-2 was sentenced recently to a term of imprisonment in these cases.

8

in Medford as Bernard was observed on October 10, 2003.  Prior to the meeting, I observed Eric Sayers's blue Chevrolet Blazer parked in front of 36 Gale Street.  During the meeting, Bernard sold CW-2 a half-ounce of methamphetamine for $900 in cash.  The methamphetamine was sent to a DEA laboratory and was determined to be 14 grams of 87% pure methamphetamine.  Bernard drove his Infiniti I-30 to get to and from the deal.

25.  On the evening of January 26, 2004, while under DEA surveillance and while wearing a recording device, CW-2 had an in-person meeting with Bernard inside 36 Gale Street.  On this occasion, CW-2 was accompanied by an undercover officer ("UCO") who was posing as CW-2's friend.  During this meeting, Bernard agreed to sell the UCO one gram of methamphetamine for $150 and he obtained from the kitchen area a glass vial filled with methamphetamine as well as a water pipe (commonly used to smoke drugs).  Bernard stated that he had 160 "double-stack sunflower" ecstasy pills, that he was selling them for $12 per pill, that the UCO could resell them for $20-$25 per pill.  The UCO agreed to purchase a few pills.  Bernard obtained a black backpack from an unknown part of the house and retrieved several black velour jewelry boxes from the backpack, explaining that he bought them on "E-Bay," that he used them to package "meth" and that he used a "heat-sealer" to seal the bags.[4]  While transferring four ecstasy pills from a jewelry box into a plastic bag, Bernard asked the UCO if he/she needed any baggies because he mistakenly ordered 21,000 plastic bags, rather than 2,100 bags, on "E-Bay."  As Bernard weighed and packaged the methamphetamine, Bernard stated that he had been selling "meth" for about 5 years, that he had been "the biggest meth dealer in Boston" in the past, that he had been selling about 3 pounds per week in Boston, and that he cut down because it was affecting his life and relationship too much.  Bernard then sold the methamphetamine and 2 ecstasy pills to the UCO for $200 in cash; Bernard also gave 2 ecstasy pills to CW-2.  The methamphetamine was sent to a DEA laboratory and was determined to be one gram of 72% pure methamphetamine.

26.  On the night of January 29, 2004, the UCO called (978) 314-8177 and had a consensually-recorded telephone conversation with Bernard.  The UCO asked if Bernard could sell the UCO "an

---

[4]  I am aware that "E-Bay" is an Internet private auction website in which people advertise and sell a wide variety of merchandise to persons, who submit bids via computer to the website.  In order to participate in this auction process, one must have access to a computer as well as an internet service provider.

ounce" but Bernard stated that he could sell the UCO a half-ounce as he did not have an ounce. Bernard asked the UCO to come to 36 Gale Street to get it at that time but the UCO postponed the deal to the following day. Bernard stated that he might not still have the methamphetamine the next day (i.e., that he might sell it to another customer) and the UCO agreed to call him the following afternoon.

27.  On the morning of January 30, 2004, CW-2 was inside 36 Gale Street meeting with Bernard, who stated that he had about 2 ounces of methamphetamine. On the late afternoon/early evening of January 30, the UCO called (978) 314-8177 and had consensually-recorded conversations with Bernard. Bernard indicated that he still had the half-ounce and that he was "in town" finishing up with his "last client." Bernard agreed to meet the UCO later at 36 Gale Street. Later that evening, while under DEA surveillance and while wearing a recording device, the UCO had an in-person meeting with Bernard inside 36 Gale Street. During this meeting, Bernard sold the UCO a half-ounce of methamphetamine for $950 in cash. The methamphetamine was sent to a DEA laboratory and was determined to be 13.7 grams of 80% pure methamphetamine.

28.  On the afternoon of February 11, 2004, the UCO called (978) 314-8177 and had a consensually-recorded telephone conversation with Bernard. Bernard stated that he had about 3 ounces of a certain type of methamphetamine that was good for snorting but not for smoking and that he wanted to give the UCO a sample of this methamphetamine before doing a deal. Bernard stated that he could give the UCO a really good price of $1,100-$1,200 per ounce. Later that evening, while under DEA surveillance and while wearing a recording device, the UCO had an in-person meeting with Bernard inside 36 Gale Street. Bernard provided the UCO with a sample of methamphetamine that he referred to as "shake" and he explained that it consisted of what was left over after the larger crystals were removed. Bernard pressed the UCO to purchase an ounce that night but the UCO stated that he/she would have to get back to Bernard. Later that night, the UCO called (978) 314-8177 and told Bernard that he/she would purchase an ounce the next day. The sample of methamphetamine given to the UCO on February 11 was sent to a DEA laboratory and was determined to be .46 grams of 19% pure methamphetamine.

29.  On February 12, 2004, while under DEA surveillance and while wearing a recording device, the UCO met with Bernard inside 36 Gale Street. During this meeting, Bernard sold the UCO one ounce of "shake" methamphetamine for $1,000. The methamphetamine

10

was sent to a DEA laboratory and was determined to be 27.9 grams of 15% pure methamphetamine. During this meeting, Bernard stated that he had a pound of methamphetamine coming in to Massachusetts in the next few days.

30. I later learned from DEA agents stationed at Logan Airport that, on February 12, 2004, they arrested two brothers named Scott and James Holyoke on state narcotics charges after they were found to be in possession of approximately 1 ½ pounds of methamphetamine. The methamphetamine was inside a Federal Express package that had been mailed from San Francisco, California and that was delivered to the Holyoke brothers at their residence in Rockland, Massachusetts. Scott Holyoke made a post-arrest statement that some of the methamphetamine was intended to be delivered to a man named "Dale."

31. On February 16 and 17, 2004, the UCO had consensually-recorded telephone conversations with Bernard concerning another purchase of methamphetamine from him. Bernard stated that his methamphetamine source had been arrested and that, as a result, he only had an ounce of the "shake" methamphetamine. The UCO declined to purchase the ounce. Bernard stated that he expected to receive more methamphetamine in the near future.

32. On February 24, 2004, the UCO had telephone conversations with Bernard concerning the purchase of one-eighth of an ounce of methamphetamine from Bernard. Bernard agreed to meet the UCO in the same supermarket parking lot in Medford as he has used on prior occasions. That evening, a surveillance agent observed Bernard driving his 1999 Infiniti from 36 Gale Street in Malden to the parking lot. The UCO entered Bernard's automobile and spoke with Bernard, who stated that he had $100,000 ripped off from him last year, that he has methamphetamine suppliers in New York City and San Francisco, and that he hides methamphetamine in food storage containers, CD boxes, or shrink-wrapped jewelry boxes to avoid detection on the street by the police. Bernard then produced a shrink-wrapped jewelry box containing methamphetamine and sold it to the UCO for $400. This meeting was recorded and surveilled by DEA. The methamphetamine sold to the UCO was sent to a DEA laboratory and determined to be 3.5 grams of 54% pure methamphetamine.

33. Immediately after the sale on February 24, the UCO exited from Bernard's Infiniti. Other surveillance agents and I observed Bernard drive through the parking lot and meet with a male, who entered the Infiniti. Bernard then drove around the parking lot with the male. After several minutes, the male was let out of Bernard's Infiniti and he entered his automobile.

11

Based on my training, experience, and involvement in this investigation, I believe that Bernard was meeting with another methamphetamine customer.

34.   In March 2004, the UCO had telephone conversations with Bernard about purchasing a larger quantity of methamphetamine. On March 10, 2004, the UCO had a consensually-recorded telephone conversation with Bernard, who stated that he had been in contact with a methamphetamine supplier in California and that he had been dealing with this source for approximately five years. Bernard explained that he would be handling the proposed methamphetamine transaction with the UCO himself as his California source did not like to fly to the East Coast.   The UCO indicated that he/she was obtaining the buy money from a hydroponic marijuana deal.   Bernard then indicated that he would be interested in obtaining a sample of hydroponic marijuana to try it out.

35.   I am aware that, on March 11, 2004, a California resident named Paul Kleinschmidt was arrested in San Diego, California after distributing approximately one pound of marijuana to an undercover DEA Task Force Agent.  After his arrest, Kleinschmidt stated that he lived at 4642 Utah Street in San Diego, that he had a methamphetamine customer named "Dale" on the East Coast, and that he and "Dale" conducted business over the computer.  I am aware that, in November 2003, Postal Inspector McCarron recovered from Bernard's trash Federal Express documents relating to a package sent by Bernard to Kleinschmidt at the Utah Street address.  Based on these and other facts developed during the investigation, I believe that Kleinschmidt is or may be the California source of supply referred to by Bernard in his conversation with the UCO on March 10, 2004.

36.   On March 18, 2004, I participated in a debriefing of a cooperating defendant who is charged in the United States District Court in Boston with distribution of methamphetamine. This defendant stated, in sum, that the defendant met Bernard in or about May 2003, that the defendant purchased methamphetamine directly from Bernard on multiple occasions until in or about October 2003, and that the defendant once gave money to Bernard to "pre-buy" an ounce of methamphetamine, i.e., Bernard stated that he sent the money out to his source of supply in California and that a package containing methamphetamine would be shipped back to him.  This package never came through and Bernard stated that it had been seized by DEA.

12

37.  On March 23, 2004, the UCO had a consensually-recorded telephone conversation with Bernard, who stated that he had had a rough last few weeks but that things were now starting to fall into place.  Bernard explained that he had a new source of supply, that he had checked out this source, and that he was a handshake away from finalizing a deal with this source which would enable Bernard to sell 1-2 pounds of methamphetamine to the UCO.  Bernard indicated that he was a few weeks away from finalizing everything.

38.  On April 1, 2004, I participated in the debriefing of another cooperating defendant who is charged with narcotics offenses in state court.  This defendant stated that the defendant had purchased methamphetamine directly from Bernard in the past and that Bernard was the biggest distributor of methamphetamine in Boston.  The defendant added that Bernard owes money to his sources of supply in California.

39.  On the evening of April 8, 2004, the UCO was called unexpectedly by Bernard, who stated that he had an ounce of methamphetamine just come across his desk.  Bernard pressed the UCO to purchase the ounce that night for $2,000.  The UCO declined to do the deal, asking Bernard instead to put something together for the following Monday (April 12).  That transaction never materialized.

40.  On April 9, 2004, Postal Inspector McCarron retrieved and searched through the discarded trash for 36 Gale Street in Malden.  Inspector McCarron recovered small plastic baggies containing a residue of what appeared to be methamphetamine. Inspector McCarron also recovered surgical gloves and a Western Union receipt for a wire transfer to Brian Welch of Costa Mesa, California.  I am aware that, in November 2003, Inspector McCarron recovered from Bernard's trash Federal Express documents relating to packages sent to Brian Welch in Tustin, California. Based on my involvement in this investigation, I believe that these records relate to money sent to California in payment for methamphetamine.

41.  On May 13, 2004, I participated in a debriefing of a cooperating defendant who is charged in the United States District Court in Boston with a methamphetamine distribution offense.  This defendant stated that the defendant had purchased methamphetamine directly from Bernard on multiple occasions in the past and that Bernard stated he was the person who brought methamphetamine to Boston.

42.   On May 15, 2004, Postal Inspector McCarron retrieved and searched through the discarded trash for 36 Gale Street in Malden.  Inspector McCarron recovered small plastic baggies similar to those used to package methamphetamine for distribution, sheets of paper containing handwritten notations concerning monies paid and owed, business cards for Unique Gifts, a renewal notice for the mailbox rental on Riverside Avenue in Medford, a delinquent notice on a Federal Express account, and a printout of a web page entitled "DMT Extraction."  Based on my training and experience, I know that DMT or dimethytryptamine is a powerful hallucinogen that is related chemically to LSD.

43.   On May 24, 2004, the UCO attempted to call Bernard but discovered that his cellular telephone was deactivated.

44.   On May 28, 2004, I retrieved and searched through the discarded trash for 36 Gale Street in Malden.  I recovered small plastic baggies similar to those used to package methamphetamine, a glass pipe similar to those commonly used to smoke methamphetamine, small jewelry boxes similar to those used by Bernard to package methamphetamine, and suspected shrink wrap.

### Bernard's Use Of A Computer

45.   During their meetings with Bernard inside 36 Gale Street, both CW-2 and the UCO observed that Bernard had a personal computer.  At the first recorded meeting with CW-2 on December 30, 2003, Bernard made a reference to using a computer. In January 2004, I caused an administrative subpoena to be served on America Online, also known as AOL, an internet service provider.  As a result, I obtained records indicating that Bernard had maintained an AOL account since June 26, 2001 and that he had various screen names, including "latransplant01."

46.   In January 2004, Bernard spoke about being able to repair computers and CW-2 gave a laptop computer to Bernard for this purpose.  On the morning of January 30, 2004, CW-2 met with Bernard inside 36 Gale Street to retrieve the laptop computer. During this visit, CW-2 obseved that Bernard's computer was activated and that an email or instant message dialog containing the screen name "latransplant01" was on the monitor.  During the ensuing conversation, Bernard stated that this was his AOL screen name, that he dealt with his source online, and that email was the safest way to do business.  Bernard explained that the person with whom he was currently speaking wanted some methamphetamine for free.  CW-2 observed that the room in which the computer was located had scales, pipes, and ecstasy pills scattered around it as well as an open digital safe containing plastic baggies.

14

47.  During the controlled purchase inside 36 Gale Street on January 26, 2004, Bernard told the UCO that he was aware that the police knew of him because some of his customers had been arrested and he assumed that they had his name and number in their cell phones.  Bernard went on to state that if he thought he was "hot" (i.e., being watched or investigated by the police), he would immediately come home and erase the hard drive on his computer.

### Arrest of Bernard on June 2, 2004

48.  On the evening of June 2, 2004, other federal agents and I executed a federal arrest warrant and arrested Bernard at his residence at 36 Gale Street in Malden.  I then participated in the ensuing execution of a federal search warrant at that address.  During the search, I seized multiple small plastic bags of suspected methamphetamine as well as vials of liquid that I suspect to be gamma hydroxybutyrate ("GHB"), a Schedule I controlled substance, or an analog chemical for GHB.  In addition, I seized numerous items of drug paraphernalia, including many plastic bags similar to those used by Bernard to package methamphetamine, several jewelry boxes similar to those used by Bernard to package methamphetamine, shrink wrap, three heat-sealing devices, and two scales.  In addition, I seized papers containing handwritten notations of amounts owed and paid as well as a handwritten chart converting grams to ounces.

49.  During the search, I observed that there was no electricity or power at the residence and it appeared that Bernard was in the process of moving out of the residence.  I spoke to the landlord, who stated that he was in the process of evicting Bernard for non-payment of rent.  Bernard also stated to me that he was in the process of moving out but he never provided me with a new address.

Sworn to and subscribed under the pains and penalties of perjury this 8th day of June 2004.

Michael P. Cashman
Special Agent, DEA

15